IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

WESTMONT LIVING, INC.,　　　　　)
　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　)　　　　Civil Action No.  3:22cv811 (RCY)
　　　　　　　　　　　　　　　　　　)
RETIREMENT UNLIMITED, INC., *et al.*,　)
　　　　Defendants.　　　　　　　　　)
_____)

## MEMORANDUM OPINION

This matter arises from a trademark dispute between two corporations that manage retirement communities and assisted living facilities on opposite coasts.  Plaintiff Westmont Living Inc. ("Plaintiff" or "Westmont") contends that Defendants Retirement Unlimited, Inc. ("RUI") and Richmond WSP, LLC ("RWSP") (together, "Defendants")[1] operate a facility with an infringing trademark.  The case is presently before the Court on the parties' cross-motions for summary judgment.  The matters have been fully briefed, and the Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and oral argument would not aid the decisional process.  E.D. Va. Loc. Civ. R. 7(J).  For the reasons stated below, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

## I.  BACKGROUND

In reviewing cross-motions for summary judgment, the Court will consider each motion separately on its own merits to determine if either party deserves judgment as a matter of law.

---

[1] When the cross-motions for summary judgment were originally filed, Defendant RWSP was not a party to this action.  However, RWSP has since been substituted for the previously named Defendant, RUI Management Services, LLC.  *See* Order, ECF No. 57.  This opinion therefore reflects that substitution.

*Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted). In considering each motion, the Court will exercise great care to resolve any factual disputes and "competing, rational inferences" in the light most favorable to the opposing party. *Id*. (internal quotation marks and citation omitted).

At the outset, the Court notes that both Plaintiff's Brief in Support of its Motion for Summary Judgment and its Brief in Opposition to Defendant's Motion for Summary Judgment include specifically captioned sections listing all material facts that Plaintiff contends are undisputed or genuinely in dispute, respectively, as required by E.D. Va. Loc. Civ. R. 56(B)[2] and consistent with Fed. R. Civ. P. 56(c)(1). Defendants include similar sections in their respective summary judgment briefing as well. Under the Local Rules, the Court may accept those facts identified by the movant as undisputed to be admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion and supported by reference to record evidence. E.D. Va. Loc. Civ. R. 56(B).

The Court has concluded that the following narrative represents the undisputed facts for the purpose of resolving the cross-motions for summary judgment:

---

[2] Local Rule 56(B) provides:

Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed. A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated *and citing the parts of the record relied on to support the facts alleged to be in dispute*. In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

E.D. Va. Loc. Civ. R. 56(B) (emphasis added). This practice is consistent with the 2011 amendments to the Federal Rules of Civil Procedure, which require the parties to support their factual assertions by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c); *see also Campbell v. Verizon Virginia, Inc*., 812 F. Supp. 2d 748, 759 n.5 (E.D. Va. 2011) (discussing 2011 amendments to Rule 56), aff'd 474 F. App'x 167 (4th Cir. June 18, 2012).

**A. Factual Background**

Plaintiff is a California corporation that manages seventeen senior living communities in California and two senior living communities in Oregon.  Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem. Supp.") 2, ECF No. 55; Pl.'s Mem. Opp'n Mot. Summ. J. ("Pl.'s Opp'n") 4, ECF No. 65.[3]  Plaintiff began operating retirement housing and assisted living facilities in October 2008 under the following mark:



(the "Westmont Mark").  Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem. Supp.") 3, ECF No. 38; Defs.' Mem. Opp'n Mot. Summ. J. ("Defs.' Opp'n") 4–5, ECF No. 66.  Relately, Plaintiff maintains rights to the following incontestable trademark registrations:

| Mark Information | Services |
|---|---|
| **WESTMONT LIVING**<br>Filing Date: May 14, 2009<br>Reg. Date: Dec. 08, 2009<br>Reg. No. 3,722,131 | Cl. 43: Dementia care, namely, providing elder care in the nature of temporary day care provided outside the home.<br>Cl. 44: Inpatient and outpatient rehabilitation services. |
| **WESTMONT LIVING**<br>Filing Date: Jun. 12, 2008<br>Reg. Date: Apr. 06, 2010<br>Reg. No. 3,772,478 | Cl. 43: Retirement housing and assisted living facilities.<br>Cl. 44: Nursing homes, home health care, skilled nursing care, and providing outpatient rehabilitation facilities; home health care for seniors. |

Defs.' Mem. Supp. 2; Pl.'s Opp'n 3; Pl.'s Mem. Supp. 3; Defs.' Opp'n 4.  Aside from a few remote workers, Plaintiff has no employees from outside the states of California and Oregon.  Defs.' Mem. Supp. 5; Pl.'s Opp'n 6.  Each individual community employs its own operations and caregiving

---

[3] For these and all other filings, the Court utilizes the pagination assigned by the CM/ECF system and not the pagination appearing on the original document.

teams, and Plaintiff's corporate and administrative staff report to one of three regional offices in California.  Defs.' Mem. Supp. 5; Pl.'s Opp'n 6.  Due to the nature of its operations, Plaintiff is unable to offer goods or services to consumers or potential residents seeking to reside in Virginia. Defs.' Mem. Supp. 5; Pl.'s Opp'n 7.[4]  Moreover, Plaintiff has no concrete plans to expand into Virginia or the mid-Atlantic region more generally.  Defs.' Mem. Supp. 5–6; Pl.'s Opp'n 7. Indeed, Plaintiff has repeatedly expressed its intent to remain a regional operator of senior living communities in California and Oregon.  Defs.' Mem. Supp. 6–7; Pl.'s Opp'n 7.

Defendant RUI is a Virginia corporation that manages senior living communities in Virginia, North Carolina, and Florida.  Defs.' Mem. Supp. 3; Pl.'s Opp'n 5.  At least some of these communities operate under different names.  *See* Defs.' Mem. Supp. 3; Pl.'s Opp'n 5.  In 2018, RUI began planning to open a senior living community in the west end of Richmond, near Short Pump.  Defs.' Mem. Supp. 3; Pl.'s Opp'n 5.  Around the same time, RUI decided to name the community "The Westmont at Short Pump" ("TWASP"), a name that combined a neighborhood in Richmond (Westmont – Pine View), with the location of the community in Short Pump.  Defs.' Mem. Supp. 3; Pl.'s Opp'n 5.  The logo RUI designed for this community is included below (the "TWASP Design Mark"):



---

[4] Beyond the obvious physical limitations inherent in providing in-person services like housing and elder care, these sorts of facilities also require licensure from the state in which they are operating.  Defs.' Mem. Supp. 5–6; Pl.'s Opp'n 7.  Plaintiff is not presently licensed to operate such facilities in Virginia.  Defs.' Mem. Supp. 5; Pl.'s Opp'n 7.

Defs.' Mem. Supp. 3; Pl.'s Opp'n 5.  Of RUI's 26 communities, only TWASP has the word

"Westmont" as part of its logo, and none of the communities use the combined words "Westmont

Living".  Defs.' Mem. Supp. 4; Pl.'s Opp'n 5.

In terms of financials and geographic reach, the parties each provide information backed

by undisputed record evidence.  Plaintiff provides the following chart, outlining the revenue it

receives from consumers in (i.e., residents from) Virginia, Florida, and North Carolina—an area

Plaintiff dubs the "Disputed Territory":

|  | Virginia | Florida | North Carolina | Total |
|---|---|---|---|---|
| Total Residents | 20 | 35 | 13 | 68 |
| Total Revenues | $769,663.17 | $1,966,375.49 | $97,421.67 | $2,833,460.33 |
| Avg./ Resident | $38,483.16 | $56,182.16 | $7,493.91 | $41,668.53 |
| 2014 Revenues | $70,964.13 | $2,500.00 | $7,559.13 | $81,023.26 |
| 2015 Revenues | $60,737.29 | $37,296.43 | $6,062.99 | $104,096.71 |
| 2016 Revenues | $72,276.48 | $71,137.85 | $0 | $143,414.33 |
| 2017 Revenues | $69,460.00 | $120,885.85 | $0 | $190,345.85 |
| 2018 Revenues | $114,989.69 | $153,338.11 | $0 | $268,327.80 |
| 2019 Revenues | $93,551.47 | $157,921.15 | $0 | $251,472.62 |
| 2020 Revenues | $119,371.98 | $315,633.59 | $0 | $435,005.57 |
| 2021 Revenues | $47,468.53 | $454,855.97 | $30,835.26 | $533,159.76 |
| 2022 Revenues | $53,474.84 | $431,905.37 | $38,623.00 | $524,003.21 |
| 2023 Revenues YTD | $67,368.76 | $220,901.17 | $14,341.29 | $302,611.22 |

Pl.'s Opp'n 14.  Defendants provide additional context to these numbers by showing their relation

to Plaintiff's overall revenue[5]:

|  | Plaintiff Revenue from Virginia Consumers | Total Plaintiff Revenue | Percentage of Total Revenue |
|---|---|---|---|
| Total (2008-Present) | $769,663.17 | $597,971,810.93 | 0.129 % |
| FY 2020 | $119,371.98 | $60,824,657.10 | 0.20 % |
| FY 2021 | $47,468.53 | $72,671,415.01 | 0.065 % |
| FY 2022 | $53,474.84 | $95,901,831.16 | 0.056 % |
| FY 2023 (thru 05/01/2023) | $67,368.76 | $45,538,668.13 | 0.148 % |

---

[5] Defendants include only revenues from Virginia consumers, as they contest Plaintiff's inclusion of North Carolina and Florida in the "Disputed Territory."  This dispute is dealt with below.

Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply") 7, ECF No. 68.  Defendants also provide context regarding the number of residents in Plaintiff's facilities relative to the total number of residents:

| Total Residents at All Westmont Living Facilities | Total number of Residents from Virginia | Percentage of Total Residents |
|---|---|---|
| 7,975 | 20 | 0.25% |

*Id.*

Finally, in terms of internet traffic, Plaintiff notes that it has received over 15,000 website visitors and more than 2,500 "paid ad clicks" from the Disputed Territory.  Pl.'s Opp'n 14.  In turn, Defendant clarifies that only 1.75 percent of the total hits to Plaintiff's website originate from Virginia.  Def.'s Reply 7.

**B. Relevant Procedural History**

Plaintiff filed a Complaint on December 28, 2022, alleging that Defendants' use of TWASP constitutes, *inter alia*, federal trademark infringement.  *See* Compl. ¶¶ 38–46, ECF No. 1.  Defendants filed their Answer on February 28, 2023, largely denying the allegations in Plaintiff's Complaint.  ECF No. 16.  Discovery ensued, and the parties filed the instant cross-motions for summary judgment on September 5, 2023.  ECF Nos. 32, 53.[6]  Specifically, Plaintiff moves for summary judgment on the general issue of trademark infringement, which underpins all of the Counts in the Complaint.  *See* Pl.'s Mot. Summ. J. 1, ECF No. 32.  Defendant conversely moves

---

[6] In the time that has elapsed since the cross-motions for summary judgment were filed, the parties have also filed various discovery- and expert-related motions.  *See, e.g.*, ECF Nos. 78, 83, 86.  Additionally, Plaintiff has moved to file a surreply to Defendants' Reply in Support of their Motion for Summary Judgment.  ECF No. 90.  However, as the discussion below reveals, the Court need not resolve any of these pending motions to reach its conclusion.

for summary judgment against all claims asserted by Plaintiff, predicated on an absence of infringement. *See* Defs.' Mot. Summ. J. 1, ECF No. 53.[7]

## II. STANDARD OF REVIEW

The standard of review for cross motions for summary judgment is well-settled in the Fourth Circuit:

> On cross-motions for summary judgment, a district court should "rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the [Federal Rule of Civil Procedure] 56 standard." *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999). Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c).

*Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (alteration in original).

The relevant inquiry in the summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. A material fact is one that might affect the outcome of a party's case. *Id*. at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc*., 264 F.3d 459, 465 (4th Cir. 2001). A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most

---

[7] While Defendants' brief only explicitly argues about trademark infringement, Plaintiff's Complaint reveals that its other claims depend upon a showing of trademark infringement. *See, e.g.,* Compl. ¶¶ 47–76. Thus, a finding of no infringement would necessarily fatally undercut the remaining claims as well.

favorable to the nonmoving party, is sufficient to allow a reasonable trier of fact to return a verdict in that party's favor. *Id*.

Furthermore, to defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another," or the "mere existence of a scintilla of evidence" concerning a material fact. *Stone v. Liberty Mut. Ins. Co*., 105 F.3d 188, 191 (4th Cir. 1997) (citations omitted); *Anderson*, 477 U.S. at 252. Accordingly, to defeat a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate." *Thompson Everett, Inc. v. Nat'l Cable Adver., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995). "Thus, if the evidence is merely colorable or not significantly probative, it may not be adequate to oppose entry of summary judgment." *Id*. (quotation marks and citation omitted).

### III. DISCUSSION

The primary issue to be decided by this Court is whether Defendants' actions constitute trademark infringement as a matter of law.[8] Finding *Dawn Donut* and its Fourth Circuit progeny clearly applicable, the Court agrees with Defendant that there is no likely confusion, and therefore no actionable infringement.

To succeed on a trademark infringement claim under the Lanham Act, the plaintiff must show (1) that it owns a valid, protectable trademark, and (2) another's use of the mark creates a likelihood of consumer confusion. *RXD Media, LLC v. IP Application Development LLC*, 986 F.3d 361, 369 (4th Cir. 2021); *see also Variety Stores, Inc. v. Wal-Mart Stores Inc*., 888 F.3d 651,

---

[8] The Court notes that Plaintiff "relies exclusively on its . . . federally registered rights in the WESTMONT Logo," and that "consideration of the common law WESTMONT Marks is unnecessary." Pl.'s Reply Supp. Mot. Summ. J. ("Pl.'s Reply") 18 n.26, ECF No. 67. As such, the Court's discussion considers only the federally registered WESTMONT marks.

660 (4th Cir. 2018).[9]  In determining whether a likelihood of confusion exists, courts in the Fourth Circuit consider the following factors: (a) the strength or distinctiveness of the mark;  (b) the similarity of the two marks; (c) the similarity of the goods or services the marks identify; (d) the similarity of the facilities the two parties use in their businesses; (e) the similarity of the advertising used by the two parties; (f) the defendant's intent; and (g) actual confusion.  *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984).  Alternatively, a court need not necessarily weigh these factors if the trademark holder and alleged infringer operate in entirely distinct markets.  *See Dawn Donut v. Hart's Food Sores*, 267 F.2d 358, 364 (2d Cir. 1959); *Johnson v. Sosebee*, 397 F. Supp. 2d 706, 708–09 (D.S.C. 2005).  Thus, while likelihood of confusion is generally a factual inquiry, summary judgment remains appropriate where the undisputed facts warrant it.  *RXD Media, LLC*, 986 F.3d at 375.

## A.  Plaintiff Owns Valid, Protectable Trademarks

Turning to the first part of the inquiry outlined above, it is quickly evident that Plaintiff owns valid, protectable trademarks.  Specifically, Plaintiff owns two federal registrations (the "Westmont Registrations") for WESTMONT LIVING design marks.  *See* U.S. Reg. No. 3,722,131 (the "'131 Mark"); U.S. Reg. No. 3,772,478 (the "'478 Mark"); Pl.'s Mem. Supp. 8; Defs.' Opp'n 4.  The Westmont Registrations are both for service marks that claim to protect the words "WESTMONT LIVING," with one large tree and one small tree above the word "LIVING."  *See* U.S. Reg. No. 3,722,131; U.S. Reg. No. 3,772,478.  The '131 Mark is for use in connection with "dementia care, namely, providing elder care in the nature of temporary day care provided outside the home" and "inpatient and outpatient rehabilitative services."  U.S. Reg. No. 3,722,131.  The

---

[9] While Plaintiff makes claims under both the Lanham Act and Virginia law, the following analysis focuses primarily on the former because "[t]he test for trademark infringement and unfair competition under the Lanham Act is essentially the same as that for common law unfair competition under Virginia law." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 n.10 (4th Cir. 1995) (citations omitted).

'478 Mark is for use in connection with "retirement housing and assisted living facilities," and "nursing homes, home health care, skilled nursing care, and providing outpatient rehabilitation facilities; home health care for seniors."  U.S. Reg. No. 3,772,478.

The Westmont Registrations are also both incontestable, as Plaintiff has satisfied the requirements listed in 15 U.S.C. § 1065.[10]  Incontestability, in turn, "is 'conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce.'" *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir. 1995) (quoting 15 U.S.C. § 1115(b)).  Therefore, pursuant to § 1115(b), Plaintiff owns valid, protectable trademarks in its Westmont Registrations.  Unfortunately for Plaintiff, the inquiry does not end there.

## B.  Defendant's Use of "Westmont" Does Not Create a Likelihood of Consumer Confusion

Trademark infringement plaintiffs must also show that another's use of "a colorable imitation of the trademark is likely to cause confusion among consumers."  *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930.  To analyze consumer confusion, courts "examine the allegedly infringing use *in the context in which it is seen by the ordinary customer*." *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 319 (4th Cir. 1992)) (emphasis in original).  That is to say, the "standard for infringement does not depend on how closely a fragment of a given use duplicates the trademark, but whether the use in its entirety creates a likelihood of

---

[10] 15 U.S.C. § 1065 provides that the right of an owner to use a registered mark is incontestable when the mark has been registered and in use continuously for five years, and the following additional requirements are met: (1) there has been no final decision adverse to the owner's right to register the mark; (2) there are no proceedings involving said rights pending in the USPTO; (3) an affidavit is filed with the Director of the USPTO "within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce"; and (4) the mark is not the generic name for the goods or services for which it is registered.  Here, all of these requirements are met, rendering the WESTMONT LIVING marks incontestable.  *See See* U.S. Reg. No. 3,722,131; U.S. Reg. No. 3,772,478.  Defendant does not appear to dispute this point.  *See* Pl.'s Mem. Supp. 8; Def.'s Opp'n 4.

confusion." *Id.* The Court finds that the so-called *Dawn Donut* rule is dispositive of the issue of likelihood of confusion in this case.

### 1. The *Dawn Donut* Rule

The *Dawn Donut* rule—derived from *Dawn Donut v. Hart's Food Stores*—is related to the contextual considerations outlined above. 267 F.2d 358 (2d Cir. 1958). *Dawn Donut* stands for the proposition that, where the parties operate in separate and distinct markets, there can be no likelihood of confusion. *See id.* at 364. Further, under such circumstances, neither an injunction nor money damages are appropriate so long as the senior trademark user possesses no imminent plans to expand into the infringer's territory. *See id*. at 364–65. ("[B]ecause there is no present prospect that plaintiff will expand its use of the mark . . . into defendant's trading area, we conclude that there is no likelihood of public confusion arising from the concurrent use of the marks and therefore the issuance of an injunction is not warranted. A fortiori plaintiff is not entitled to any accounting or damages."); *see also Johnson v. Sosebee*, 397 F. Supp. 2d 706, 707 (D.S.C. 2005) ("[A] finding of no likelihood of confusion precludes both injunctive relief and any recovery of [defendant's] profits . . . [because] no infringement has taken place [and] where there is no infringement, there can be no recovery."). The underlying rationale is simple—when there is no likelihood that the senior federal registrant will expand their use, the geographic separation between the two uses renders consumer confusion impossible. *See Dawn Donut*, 267 F.2d at 364; 5 McCarthy on Trademarks and Unfair Competition § 26:33 (hereinafter, "McCarthy").

The majority of circuits—including the Fourth—have adopted the *Dawn Donut* rule or its functional equivalent. *See, e.g., Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 931–32 (4th Cir. 1995); *American Foods, Inc. v. Golden Flake, Inc.,* 312 F.2d 619, 626 (5th Cir. 1963); *Holiday Inns of America, Inc. v. B & B Corp.,* 409 F.2d 614, 618–19 (3d Cir.

1969); *Mister Donut of America, Inc. v. Mr. Donut, Inc.,* 418 F.2d 838, 844 (9th Cir. 1969); *Coach House Rest. v. Coach & Six Rests*., 934 F.2d 1551, 1562 n.49 (11th Cir. 1991); *Minn. Pet Breeders v. Schell & Kampeter,* 41 F.3d 1242, 1246 (8th Cir. 1994).

The Fourth Circuit in particular has continued to apply *Dawn Donut* and its underlying rationale.  For instance, in the *What-A-Burger* case, the court stated that, "[a]lthough 'a senior federal registrant has superior priority' which extends nationwide, 'there is *no likely confusion* for a court to enjoin unless and until the senior user shows a likelihood of entry into the junior user's trade territory." *What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi, Tex.*, 357 F.3d 441, 451 (4th Cir. 2004) (quoting 5 McCarthy § 26:33) (emphasis in original).  In *Lone Star Steakhouse*, the Court likewise applied *Dawn Donut* to deny injunctive relief.  *See Lone Star Steakhouse*, 43 F.3d at 932 ("Plaintiff . . . cannot properly seek an injunction against [Defendant] because [Plaintiff] has neither entered the . . . market area where [Defendant] does business nor has presented evidence that it plans to expand to that area.").  Lower courts in the Fourth Circuit continue to steadfastly apply the principles espoused in *Dawn Donut* and *What-A-Burger*.  *See, e.g., Johnson v. Sosebee*, 397 F. Supp. 2d 706, 708–11 (D.S.C. 2005) (applying *Dawn Donut* to deny injunctive and monetary relief); *Applause Prod. Grp., LLC v. Showtime Events Inc.*, No. GJH-16-1463, 2017 WL 1906588, at *3–4 (D. Md. May 4, 2017) (applying *Dawn Donut* to reject a claim of trademark infringement).

A trademark infringement plaintiff can potentially thwart the application of the *Dawn Donut* or *What-A-Burger* territoriality rule by providing sufficient evidence of market penetration in the disputed area.  This is because proof of market penetration may indicate that the trade territories at issue are *not* separate and distinct.  Market penetration is typically assessed by reference to factors such as:  (1) plaintiff's dollar value of sales in the contested market; (2) the

number of customers relative to the population of the state; (3) relative and potential growth of sales; and (4) the number of persons actually purchasing or registering for the product in relation to the total number of potential.  *See, e.g., Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 929 (8th Cir. 1967); *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1122 (S.D. Cal. 2014).

### 2. The *Dawn Donut* Rule Controls the Present Analysis

Here, Plaintiff alleges that Defendant's use of "The Westmont at Short Pump" constitutes trademark infringement.  *See* Pl.'s Mem. Supp. 19–21.  In response, Defendant first invokes the *Dawn Donut* rule to argue that the geographic separation between the parties' trade territories precludes a finding of consumer confusion.  *See* Defs.' Opp'n 2, 17–20; *see also* Defs.' Mem. Supp. 13–19.  Defendant also argues that, regardless of the applicability of *Dawn Donut*, an analysis of the relevant likelihood of confusion factors also compels a finding of noninfringement. *See* Defs.' Mem. Supp. at 19–30; Defs.' Opp'n 20–30.  The Court need not reach Defendant's second argument, because the principles espoused in cases such as *Dawn Donut* and *What-A-Burger* are indeed dispositive.  A brief review of the relevant caselaw is instructive.

In *Dawn Donut*, the plaintiff was the national senior user of the mark DAWN for doughnut mix.  *See Dawn Donut*, 267 F.2d at 361.  The junior user adopted and used the mark DAWN for selling doughnuts within a six-county area of New York near Rochester.  *See id.*  With one isolated exception that occurred thirty years prior to the lawsuit, the plaintiff's closest use of its DAWN mark to defendant's operations was over 60 miles from the defendant's trading area.  *See id.* Additionally, the facts showed that plaintiff was unlikely to enter the defendant's territory in Rochester.  *See id.* at 364–65.  The court stated that "[a]s long as plaintiff and defendant confine their use of the mark 'Dawn' in connection with the retail sale of baked goods to their separate trading areas it is clear that no public confusion is likely."  *Dawn Donut*, 267 F.2d at 364.

13

Therefore, "the decisive question . . . is whether plaintiff's use of the mark . . . is likely to be confined to its current area or of use or whether . . . it is likely to expand the . . . use of the mark into defendant's trading area." *Id.* at 364.  Because such expansion was unlikely, the court found that there was no likelihood of public confusion arising from the parties' concurrent use of the DAWN mark.  *See id.* at 365.  The *Dawn Donut* court also approved of the district court's having taken judicial notice of the local nature of the defendant's business.  *See id.* at 364 ("The district court took note of what it deemed common knowledge, that 'retail purchasers of baked goods, because of [their perishable nature], usually make such purchases reasonably close to their homes.' No objection is made to this finding and nothing appears in the record which contradicts it as applied to this case.").

*What-A-Burger* represents perhaps the most notable instance in which the Fourth Circuit has applied rationale akin to that espoused in *Dawn Donut*.  There, the plaintiff, What-A-Burger of Virginia, Inc. ("Virginia W-A-B"), operated hamburger chain restaurants dubbed "What-A-Burger," solely in Virginia.  *See What-A-Burger*, 357 F.3d at 444.  The defendant, Whataburger, Inc., of Corpus Christi, Texas ("Texas WAB") operated "Whataburger" franchises throughout the southern United States and Mexico.  *Id.*  Virginia W-A-B sought a declaratory judgment of noninfringement, and Texas WAB counterclaimed seeking a declaration that it was entitled to exclusive use of the trademark in Virginia.  *See id.* at 445–46.  The court eventually noted that "the primary obstacle . . . here . . . is that there was never any *infringing use* of the mark by Virginia W-A-B." *Id.* at 448 (emphasis in original).  Crucially, the court relied on the same sort of reasoning employed by the *Dawn Donut* court to reach this conclusion:

> An informed analysis of whether the likelihood of confusion exists cannot rest solely on a 'side-by-side' comparison of the marks without regard to the marketplace in which they are used. . . .  For example, courts have considered 'the similarity in scope of the parties' geographic markets' in deciding whether a

14

> likelihood of confusion exists. . . .  The fact that Texas WAB and Virginia W-A-B operate in separate territorial markets—and that Texas WAB professes no plan to enter the Virginia market—raises significant doubt that Virginia W-A-B's use of the mark creates the 'likelihood of confusion' required for infringement.

*Id.* at 450 (internal citations omitted).  Therefore, fatal to any potential infringement claim brought by Texas WAB was the fact that "'there is *no likely confusion* for a court to enjoin unless and until the senior user shows a likelihood of entry into the junior user's trade territory.'"  *See id.* at 451 (quoting 4 McCarthy at § 26:33).

A smattering of other cases both in the Fourth Circuit and beyond reveals the continuing validity of the *Dawn Donut* doctrine.  *Johnson v. Sosebee* provides one such example.  There, the plaintiff, a South Carolina-based land surveying corporation, sued the defendant, a South Carolina-based land surveyor, for trademark infringement.  *Johnson v. Sosebee*, 397 F. Supp. 2d 706, 707 (D.S.C. 2005).  It was undisputed that the plaintiff did not perform surveying work in the four South Carolina counties in which the defendant performed such work.  *Id.*  Regardless, the plaintiff sought to enjoin the defendant's use of an allegedly infringing mark in connection with his surveying business.  *Id.*  Noting that the plaintiff's trade territory did not extend into the defendant's, the court ultimately held that "absent [such market] penetration, the court has consistently held that no consumer confusion—and thus no infringement—is possible."  *Id.* at 711.  Several relevant facts compelled this holding.

First, the court reiterated the admonition from *What-A-Burger* that the nature of a business—including whether it is a "local business"—is relevant to the confusion inquiry.  *Id.* at 709–10 (citing *What-A-Burger*, 357 F.3d at 450 n.7).  The court then elaborated upon what it means to be a "local business":  "a 'local business' is one that, either due to high transportation costs or access limited to local consumers, serves a limited area. . . .  A business may accurately be deemed non-local if it can perform its services for distant customers with no disadvantage to

either customer or business, such that a customer is as likely to select a remote service provider as a nearby one." *Id.* at 710.  The court found that surveying is a local business because (1) "distance from the customer" is a significant factor, (2) it is "tied to a certain area," and (3) "[a] surveyor must physically be upon the land in order to perform his service." *Id.*  In turn, the court stated that it had "no difficulty in finding that a distance of over 170 miles is far enough to clearly constitute distinct territories serving different consumers." *Id.* at 711.

While *Johnson* represents one of the more thorough expositions of the *Dawn Donut* and *What-A-Burger* principles, courts in the Fourth Circuit and beyond have consistently affirmed and applied the rationale underlying these decisions as well.  *See, e.g., Cross Trailers, Inc. v. Cross Trailer Mfg. and Sales, LLC*, 363 F. Supp. 3d 774, 783 (W.D. Tex. 2018) (noting that *Dawn Donut* can be dispositive where there is a pronounced geographic disparity between the plaintiff and defendant's trading areas); *Applause Prod. Grp., LLC v. Showtime Events Inc.*, No. GJH-16-1463, 2017 WL 1906588, at *4 (D. Md. May 4, 2017) (noting that consumer confusion is unlikely where the facts fail to suggest that the plaintiff's mark has been sufficiently "carried into" the defendant's market, and that mere internet presence does not render national an otherwise local business); *Russell Road Food and Beverage, LLC v. Spencer*, No. 2:12-CV-01514-LRH, 2013 WL 321666, at *2 (D. Nev. Jan. 28, 2013) ("[T]erritorial divisions may prevent confusion" where the parties are confined to "sufficiently distinct and geographically separate markets.").

Returning to the parties' arguments in the present dispute, Defendant contends that the *Dawn Donut* rule and its progeny are a complete defense to Plaintiff's claim of trademark infringement.  Defs.' Mem. Supp. 16.  Plaintiff counters that Defendant's reliance on the "esoteric, outdated, and inapplicable legal doctrine"—i.e., *Dawn Donut*—is a "thinly veiled attempt to cover up [its] willful infringement."  Pl.'s Opp'n 3.  However, Plaintiff's claim that the *Dawn Donut*

doctrine is outdated does not make it so.  Likewise, Plaintiff's apparent distaste for the doctrine does not render it inapplicable where, as here, the facts clearly support its application.  Instead, as outlined above (and discussed further below), courts have continued to apply the rationale from cases like *Dawn Donut* and *What-A-Burger* in recent years.  Moreover, the fact pattern here is legally indistinguishable from cases like *Johnson v. Sosebee* and *Applause Production Group*, two well-reasoned opinions from within this circuit.

Here, as in both *Johnson* and *Applause Production Group*, the parties' trade territories are limited to their physical areas of operation—and therefore do not overlap—because they are local businesses operating on opposite coasts.  *See Johnson,* 397 F. Supp. at 710–11.  Assisted living facilities, retirement homes, and temporary day care for the elderly, like surveying and event management companies, are local businesses because their operation is necessarily tied to their physical presence in a given area.  *See id.* at 710; *Nat'l Ass'n for Healthcare Commc'ns, Inc. v. Cent. Ark. Area Agency on Aging*, 257 F.3d 732, 737 (8th Cir. 2001) (explicitly holding that facilities providing services similar to those at issue here are businesses with small, local trade areas, confined to their particular localities); *Applause Prod. Grp.*, 2017 WL 1906588 at *4; *see also* 5 McCarthy § 26:29.  That is, such businesses can only provide their services to the geographic areas in which they are physically present (i.e., where they have properly licensed facilities and/or employees).  *See Johnson*, 397 F. Supp. at 710; *Applause Prod. Grp.*, 2017 WL 1906588 at *4.  While a business may be deemed *non-local*—and therefore have a *broader* trade territory—if it can "perform its services for distant customers with no disadvantage to either customer or business, such that a customer is as likely to select a remote service provider as a nearby one," *Johnson*, 397 F. Supp. at 710, such is simply not the case for the type of businesses

17

at issue here.[11]  *See, e.g., Applause Prod. Grp.*, 2017 WL 1906588 at *4 ("While both companies advertise [widely], their business models are inherently local, providing services that require . . . in-person contact, within specific, distinct geographic areas.").  For the same reason, Plaintiff's broad advertising does not render national its otherwise local business.  *See id.* (noting that broad advertising over the internet does not transform an inherently local business into a national one).

Additionally, Plaintiff does not possess licenses to operate any facilities in Virginia, so it in fact does not do business in Virginia.  *See Lone Star Steakhouse*, 43 F.3d at 932.  And just as in *Johnson*, Plaintiff here has failed to prove a likelihood of entry into Virginia, insofar as it lacks concrete, impending plans to enter Defendant's market.  *See Johnson*, 397 F. Supp. at 710–11; 5 McCarthy § 26:33.  Plaintiff is therefore forced to resort to an argument that Defendant's facilities—located on the opposite coast—infringe on its trademarks.  This sort of significant geographic separation[12] between local businesses, coupled with the lack of any legally cognizable consumer overlap,[13] compels application of the principles espoused in *Dawn Donut*, *What-A-Burger*, and their progeny.  Plaintiff makes many arguments to the contrary, but they are all unavailing.

First, Plaintiff argues that it has indeed penetrated the relevant market, rendering *Dawn Donut* and its principles inapplicable.  *See* Pl.'s Opp'n 16–18; Pl.'s Reply 4–9.  However, Plaintiff's "evidence" of market penetration is dubious.  For instance, Plaintiff points to the

---

[11] Realistically, the only two ways in which a business such as Plaintiff's reaches consumers from locales as distant as Defendants' are:  (1) the consumer moves, thus becoming a resident of California or Oregon to actually obtain the services; or (2) someone in Virginia pays for an individual to obtain the services in California or Oregon. Either way, there is some "disadvantage to either customer or business," rendering the underlying business local.  *See Johnson*, 397 F. Supp. at 710.

[12] The Court has no issue finding that *Dawn Donut* and *What-A-Burger* are applicable here, where the parties operate on opposite sides of the country.  Indeed, the geographic separation in cases like *What-A-Burger*—southern United States and Virginia—and *Johnson*—two South Carolina counties separated by 170 miles—was not as pronounced as it is here.

[13] To the extent there is *any* consumer overlap, it is *de minimis*, as discussed in greater detail below.

following as evidence of market penetration in Virginia: (1) Plaintiff's internet presence, generally; (2) twenty people from Virginia have moved to California to go to Plaintiff's facilities; (3) a small percentage of visitors to Plaintiff's website are from Virginia; and (4) Plaintiff receives applications from job applicants in the southeast region. *See* Pl.'s Reply 4–5.

Beginning with the two internet-based arguments, caselaw is clear that marketing, advertising, and promoting a mark over the internet is insufficient to establish market penetration, particularly where the business in question is local. *See, e.g., Dudley v. Healthsource Chiropractic, Inc.*, 883 F. Supp. 2d 377, 394 (W.D.N.Y. 2012) ("Plaintiff assumes that the internet is a territory in which he can establish exclusive rights.  The internet is not, however, a geographic territory to be subdivided. . . .  The rights of concurrent users would be substantially harmed if one user were able to monopolize the internet to the exclusion of other lawful users of the same mark."); *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1122–23 (S.D. Cal. 2014) (noting that, without more, evidence of internet presence and site visits is insufficient to establish market penetration) (collecting cases); *Applause Prod. Grp.*, 2017 WL 1906588 at *4 ("While both companies advertise on the Internet and social media, their business models are inherently local, providing services that require . . . in-person contact, within specific, distinct geographic areas."); 5 McCarthy § 26:30.50 ("[M]erely because a Web site featuring a trademark can . . . be accessed on computers from Florida to Alaska . . . does not mean that the trademark is known and established in all those locations.  Knowledge among persons in the territories in issue must be proven by evidence, not just assumed.") (collecting cases).  Instead, "[m]arket penetration by internet use of a mark should be determined . . . by evidence as to the place where buyers actually purchased the goods and services advertised on the internet site."  5 McCarthy § 26:30.50.

Plaintiff's reliance on internet "hits" of its website from Virginia users is similarly misguided.  First, these "hits" represent only 1.75 percent of the overall user hits to Plaintiff's website.  *See* Defs.' Reply 8.  Further, evidence regarding internet *traffic* is hardly dispositive on the issue of market penetration.  *See* 5 McCarthy § 26:30.50 ("Knowledge among persons in the territories in issue must be proven by evidence, not assumed just because the Internet is national. . . .  Market penetration by internet use of a mark should be determined, primarily by evidence [regarding] where buyers actually purchased the goods and services advertised [online].")

This brings the Court to Plaintiff's next arguments against the applicability of *Dawn Donut*—that people from Virginia have moved to California to go to Plaintiff's facilities, and that Plaintiff receives job applications from applicants in the "Disputed Territory," which it identifies as Virginia, North Carolina, and Florida.  *See* Pl.'s Opp'n 4, 14–16.  These arguments are similarly unavailing.  Preliminarily, Plaintiff's attempt to lump North Carolina and Florida into the allegedly "Disputed Territory" is improper.  As Defendant notes, "Plaintiff is conflating RUI generally with its single TWASP community in Virginia."  Defs.' Reply 10.  That is to say, the only community Defendant operates with an allegedly infringing mark is TWASP, which is located in Virginia.  Therefore, to the extent a "Disputed Territory" exists, the Court finds that it is solely Virginia.

Further, while the facts do show that some individuals have moved from Virginia to California to go to its facilities, *see* Pl.'s Opp'n 13–16, sales that are "so small, sporadic, and inconsequential that present and anticipated market penetration is *de minimus* [sic]" cannot constitute market penetration.  *See Sweetarts*, 380 F.2d at 929.  The sales here certainly fall into the *de minimis* category as they represent only .129 percent of Plaintiff's overall revenue, and twenty individuals represents a laughably small fraction of the entire senior- and assisted-living population and/or potential population (i.e., customers and/or potential customers) in Virginia.  *See*

*Hanginout, Inc.*, 54 F. Supp. 3d at 1121 (analyzing market penetration by comparing the number of persons actually purchasing the pertinent product or service in relation to the total number of potential customers).  Though plaintiff repeatedly points to the raw numbers for evidence of market penetration in Virginia, it is clear that the percentages are what matter, *see id.*; *see also Sweetarts*, 380 F.2d at 929, and those percentages simply do not support Plaintiff's assertion that they have penetrated the relevant market.[14]  And even assuming *arguendo* that the volume of individuals were more significant, the Court is not persuaded that the fact that individuals moved from Virginia to California to obtain the services of a California business represents market penetration *in Virginia*, because the services are still being rendered *in California*.  *See Johnson*, 397 F. Supp. 2d at 706 (noting that for local businesses, the relevant trade territory is the physical place where the business actually renders its services).

Plaintiff next argues that *Dawn Donut* has been significantly limited by *Guthrie Healthcare System*, a more recent Second Circuit decision.  *See* Pl.'s Opp'n 16–18, ECF No. 65.  This argument misses the mark as well.  The *Guthrie* court held that the plaintiff had sufficiently shown that the defendant was infringing Plaintiff's mark in its main service area.  *See Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 48 (2d Cir. 2016).  In order to prevail, the plaintiff had shown that its "activities and commercial relationships had extended beyond that [main service] area, rendering it vulnerable to plausibly foreseeable confusions and harms resulting from [d]efendant's use of the marks outside the Guthrie service area."  *Id.*  Based on this spillover of "activities and commercial relationships," *Guthrie* is distinguishable on the facts from *Dawn Donut*, and likewise is distinguishable from the facts at bar.  Defendants are not using the TWASP

---

[14] Only .129 percent of Plaintiff's overall revenue comes from Virginia consumers.  *See* Def.'s Reply 7. Moreover, only .25 percent of Plaintiff's residents are from Virginia.  A percentage of a single percentage point clearly falls into the *de minimis* category deemed insufficient to establish market penetration.

mark in—or even around the fringes of—Plaintiff's main service areas of California and Oregon, and as outlined above, Plaintiff has not made a plausible showing that its activities extend beyond that area into Virginia.

Lastly, Plaintiff makes some passing arguments that *Dawn Donut* and its principles are no longer applicable in the present, mobile age. *See* Pl.'s Opp'n 16–17 n.2. This is a tired argument that has been unsuccessful elsewhere. *See, e.g., Cross Trailers, Inc. v. Cross Trailer Mfg. and Sales, LLC*, 363 F. Supp. 3d 774, 782 (W.D. Tex. 2018) ("[A]t the time of *Dawn Donut*, geographical economic boundaries were already a dissolving relic. The internet . . . seems revolutionary—and the Court will not destroy its credibility by claiming otherwise—but . . . by the time of the Fifth Circuit's last citation to *Dawn Donut* in 1997, the internet, eBay, and Amazon existed. . . . The Court cannot conclude that the Fifth Circuit's acceptance of *Dawn Donut* was unknowing of modern electronic commerce."). So too here. And in any event, the Fourth Circuit's *What-A-Burger* decision from less than two decades ago—i.e., squarely in the internet age—is based on considerations similar to those in *Dawn Donut.* Therefore, embedded within the *What-A*-Burger decision is an implicit acknowledgement that geographic separation between parties may still bar a finding of likely confusion, even in light of the technological developments since *Dawn Donut.* The Court thus declines to depart from *Dawn Donut*, *What-A-Burger*, and the majority of courts continuing to apply similar principles. *See* 5 McCarthy § 26:34 (collecting cases).

Accordingly, the Court holds that Plaintiff has failed to prove by a preponderance of the evidence that Defendant has infringed on its trademarks, because the undisputed facts clearly establish that Plaintiff and Defendant operate in entirely distinct geographic markets and therefore there is no likelihood of consumer confusion.

**IV. CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment

and deny Plaintiff's Motion for Summary Judgment.

An appropriate Order will accompany this Memorandum Opinion.

_____ /s/

Roderick C. Young
United States District Judge

Richmond, Virginia
Date: November 3, 2023